**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **KATHLEEN HITCHCOCK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 12 C 4994** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kathleen Hitchcock seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. 42 U.S.C. § 1381a. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. After careful review of the record, the Court now denies Plaintiff's motion, grants Defendant's motion, and affirms the decision to deny benefits.

## PROCEDURAL HISTORY

Plaintiff applied for SSI on May 7, 2009, alleging that she became disabled on April 10, 2009 due to mental illness. (R. 127, 147). The Social Security Administration denied the applications initially on October 16, 2009, and again

---

[1]  Ms. Colvin became Acting Commissioner of Social Security on February 14, 2013, and is substituted in as Defendant pursuant to Federal Rule of Civil Procedure 25(d)(1).

upon reconsideration on February 17, 2010. (R. 77-83, 85-88). Plaintiff filed a timely request for hearing and appeared before Administrative Law Judge Michael Hellman (the "ALJ") on November 4, 2010. (R. 31). The ALJ heard testimony from Plaintiff, who was represented by counsel, as well as from vocational expert James Breen (the "VE"). Shortly thereafter, on January 21, 2011, the ALJ found that Plaintiff is not disabled because there are a significant number of jobs she can perform in the national economy. (R. 16-24). The Appeals Council denied Plaintiff's request for review on April 30, 2012, (R. 1-3), and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

In support of her request for remand, Plaintiff argues that the ALJ: (1) ignored medical evidence favorable to her claim; and (2) failed to account for all of her mental limitations in making the residual functional capacity ("RFC") determination, resulting in an incomplete hypothetical question to the VE. As discussed below, the Court finds that the ALJ's decision is supported by substantial evidence and need not be reversed or remanded.

## FACTUAL BACKGROUND[2]

Plaintiff was born on November 4, 1964, and was 46 years old at the time of the ALJ's decision. (R. 127). She has a high school diploma, spent three years at college, and claims to have worked as a secretary, model, and Avon sales representative. (R. 35-38).

---

[2]    Consistent with Plaintiff's arguments for remand, this opinion addresses her mental as opposed to physical impairments.

## A.    Medical History

### a.    2009

The first available medical record is dated June 1, 2009, just three weeks after Plaintiff's May 7, 2009 application for benefits.  At that time, Plaintiff went to the Oak Forest Hospital ("Oak Forest") emergency department complaining that she felt depressed.   (R. 288).   She reported being assaulted in 2002 with resulting head injuries, but said she did not seek medical treatment due to financial difficulties.  (R. 288, 293).   On psychiatric evaluation, Plaintiff exhibited pressured (excessive and rapid) speech and racing thoughts, and B. Thomas, Ph.D., was not certain whether she suffered from Anxiety Disorder, Depression or Bipolar Disorder.  (R. 293).   When Plaintiff returned to Oak Forest on June 15, 2009, she continued to complain of depression, along with excessive worrying and racing thoughts.  She was diagnosed with Depressive Disorder, N.O.S. (not otherwise specified) and rule-out Bipolar Disorder, and prescribed Abilify.  (R. 245).

Several months later, on September 15, 2009, Mary M. Pfeiffer, Ph.D., conducted a psychological examination of Plaintiff for the Bureau of Disability Determination Services ("DDS").  (R. 211-15).  Plaintiff told Dr. Pfeiffer that she was depressed, out of work, and "in pain," and has crying spells once a week. (R. 211).  She also discussed her 2002 assault and brain injury, stating that she was unconscious for two hours.  (R. 212).  During the evaluation, Plaintiff was cooperative but "needed constant redirection" and "would speak on and on until [the doctor] interrupted her."   (R. 213).   Dr. Pfeiffer described Plaintiff's

interpersonal manner as sincere but intrusive, with a lack of awareness regarding interpersonal cues. (*Id.*). Though Plaintiff said she felt depressed, Dr. Pfeiffer found that her mood was elevated and her affect was labile (easily altered). She was generally coherent during the exam, but also "somewhat circumstantial and disorganized" and "lacking in goal direction." (*Id.*).

Dr. Pfeiffer diagnosed Plaintiff with Bipolar Disorder and Neuropsychological Deficits Secondary to Traumatic Brain Injury. (R. 214-15). Plaintiff appeared to be "hypomanic and hyperverbal," and she "demonstrated highly impaired boundaries and a striking lack of awareness about her own interpersonal behavior." (R. 215). Dr. Pfeiffer reported that Plaintiff's immediate and recent memory are intact, but that her past memory is "quite impaired." She also showed "impairments in capacity to do calculations and some impairment in judgment and insight." (*Id.*). Dr. Pfeiffer was not sure how much of Plaintiff's functional impairment is due to Bipolar Disorder versus the brain injury, and noted that Plaintiff's capacity to observe her own behavior "may be very impaired as well." (*Id.*).

Approximately one month later, on October 13, 2009, M. W. DiFonso, Psy.D., completed a Psychiatric Review Technique of Plaintiff for DDS. (R. 221-33). Dr. DiFonso indicated that Plaintiff suffers from Bipolar Syndrome, (R. 224), and that she has mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 231). In a Mental Residual Functional Capacity Assessment completed the same day, Dr. DiFonso stated that Plaintiff

is moderately limited in the ability to: understand, remember, and carry out detailed instructions; and maintain attention and concentration for extended periods. (R. 235). (R. 235-37). Based on treatment notes from Oak Forest and the assessment from Dr. Pfeiffer, Dr. DiFonso concluded that Plaintiff's "cognitive and attentional skills are intact and adequate for simple one-two step work tasks." (R. 237). Dr. DiFonso explained that Plaintiff's interpersonal and adaptive skills are both "within normal limits," she "carries out a fair range of daily activities," and she "performs well on cognitive tasks." (*Id.*).

On November 20, 2009, Plaintiff went to the John H. Stroger Jr. Hospital ("Stroger") emergency department complaining of depression. (R. 248-49). She exhibited pressured speech and flight of ideas, (R. 248), and requested a CT scan of her brain to help with her disability case. (R. 249). The doctor found the CT scan unnecessary and diagnosed Plaintiff with possible Bipolar Disorder. (R. 249). The doctor also referred her to social services due to depression and a "risk of being homeless." (R. 260). The record does not indicate whether Plaintiff pursued this assistance.

### b.    2010

On February 10, 2010, Donald Henson, Ph.D., affirmed Dr. DiFonso's October 13, 2009 assessment that Plaintiff is not disabled from her mental impairments. (R. 261-63). The following month, on March 31, 2010, Plaintiff returned to Oak Forest for a mental consultation. (R. 286-87). Carolina Garcia, M.S., a psychology intern under the supervision of John (Jack) N. Canzona, Psy.D., noted that Plaintiff's speech was pressured and disorganized, and her

thought processes were "at times tangential and disorganized with bizarre content." (R. 287). Ms. Garcia diagnosed Psychotic Disorder, N.O.S. and rule-out Bipolar Disorder, and indicated that Plaintiff might benefit from a "partial hospitalization program." (*Id.*). Plaintiff next saw Ms. Garcia on April 18, 2010 and reported constant worries about money and marriage. Her judgment and insight were both impaired, her mood was exaggerated, she felt hopeless and helpless, her behavior was agitated, and her thoughts were disorganized. (R. 285). Given these symptoms, Ms. Garcia referred Plaintiff for a consultation with a psychiatrist. (*Id.*).

Plaintiff saw the psychiatrist, Samina Khattak, M.D., on April 26, 2010 and was diagnosed with Psychosis, N.O.S. and Depressive/Bipolar Disorder, N.O.S. (R. 284). When Plaintiff returned to Ms. Garcia on May 7, 2010, her judgment and insight remained impaired, her mood was exaggerated and anxious, and her behavior was agitated. (R. 283). Plaintiff's thought processes were once again disorganized with bizarre content, and Ms. Garcia referred her for neuropsychological testing. (*Id.*). Three days later, on May 10, 2010, Plaintiff saw Roy Gilliland, Ph.D., at Oak Forest. (R. 281-82). At that time, she was taking Abilify and Zoloft as prescribed by Dr. Khattak. Plaintiff proved to be an "extremely difficult historian" and had "many scraps of paper with various life goals and reminders for tasks." (R. 281). Dr. Gilliland noted that Plaintiff's insight was impaired and her judgment was fair, and he diagnosed Psychotic Disorder, N.O.S., rule-out Bipolar Disorder, rule-out Mood Disorder due to head injury, and rule-out Cognitive Disorder, N.O.S. (R. 281-82).

At an appointment with Ms. Garcia on July 1, 2010, Plaintiff's condition was largely unchanged from the previous visit. Her thought content remained bizarre at times but Ms. Garcia praised her for "presenting her ideas in a more structure[d] way." (R. 276). When Plaintiff saw Dr. Khattak a week later on July 8, 2010, she was calm and comfortable and "verbalized a good understanding." (R. 275). At a follow-up appointment with Dr. Khattak on August 2, 2010, however, Plaintiff exhibited fleeting thoughts and reported "pain in my brain." (R. 273). Dr. Khattak diagnosed Bipolar Disorder, N.O.S., and prescribed Abilify, sertraline, Topamax and Klonopin. (*Id.*). The same day, Plaintiff met with Ms. Garcia and expressed "helpless feelings regarding her financial situation and the lack of business/work." (R. 272). Her thought processes were still disorganized and Ms. Garcia recommended a referral to a "day program where more integrated and intensive services can be provided." (*Id.*).

Plaintiff canceled her next two appointments with Ms. Garcia and appeared at Oak Forest again on September 27, 2010. (R. 269, 270, 271). Jessica Mack, Ed.S., another psychology intern under Dr. Canzona's supervision, examined Plaintiff and noted that she had impaired judgment, insight and decision-making. She also exhibited delusions and a tangential/loose mental status, but her mood was pleasant and stable, and she demonstrated appropriate behavior. (R. 269). Plaintiff complained of feelings of hopelessness and helplessness, financial difficulties, and cognitive deficits stemming from her brain injury, and her thoughts remained disorganized. (*Id.*).

On October 13, 2010, Wendy Lewis, M.A., a psychology intern under the supervision of Dr. Gilliland, completed a neuropsychological evaluation of Plaintiff. (R. 265-68). Ms. Lewis observed that Plaintiff's "thought process was extremely tangential and disorganized," (R. 266), and found her to have "average to below average premorbid functioning and intact memory, with notable impairment in the areas of executive functioning, attention, verbal fluency, confrontation naming, and manual fine motor skills." (R. 268). There were several factors suggesting "the possibility of psychosis," and Ms. Lewis concluded that Plaintiff's "psychiatric history of delusions, depression, previous manic presentation, and current clinical presentation support her diagnosis of Schizoaffective Disorder." (*Id.*). That said, it was not clear whether Plaintiff's disorganization and distractibility in daily functioning would inhibit her ability to work. (*Id.*).

**B.  Plaintiff's Testimony**

In an August 2009 Function Report completed in connection with her application for disability benefits, Plaintiff stated that she takes care of herself, her father and her dog, and she is able to bathe, dress, and prepare three meals a day. (R. 158-59). She also cleans the kitchen every day, does the laundry every week, and takes out the garbage. (R. 159). Plaintiff does not have a driver's license but she does use public transportation and can manage her finances, though she indicated that her lack of money "changed" and "depressed" her. (R. 160-61). With respect to hobbies and social activities, Plaintiff stated that she has not done any arts and crafts in two years and sews only once in a

while. She "often" tries to help her friends, however, and goes to church once a month. (R. 161). She can also pay attention for "pretty long," finish what she starts, follow written and spoken instructions "very well," and be "obedient" and "get along" with authority figures. (R. 162-63).

At the November 4, 2010 hearing before the ALJ, Plaintiff testified that she lives with her father and "self-educated myself for about 15 years, since the attack on my brain by the robbers." (R. 34, 35). After she applied for benefits, she tried to find work with some 50 employers but believes her brain injury has prevented her from getting hired. (R. 39-40). Plaintiff said that her head is "foggy," and feels like "blood in the brain." (R. 41, 42). Her medications help to calm her down, (R. 44), but she gets panic attacks and has a lot of anxiety. (R. 48). In discussing her activities, Plaintiff stated that she cleans the house, empties the dishwasher, brings up the laundry, vacuums, dusts, cares for her puppy, and cooks. (R. 50-51, 58). These activities make her feel like she's "worth something." (R. 65). Plaintiff is able to bathe and dress herself though it takes "a long time," (R. 54), and she can walk to the store. (R. 56). For fun, she watches a lot of cartoons, listens to music, and watches movies on television. (R. 56-57). She also goes to church, (R. 59), and says she has a lot of friends. (R. 61).

## C.  Information from Plaintiff's Father

On August 18, 2009, Plaintiff's father, Tom Hitchcock, submitted a Function Report – Adult Third Party on behalf of his daughter's application for benefits. (R. 174-81). Mr. Hitchcock stated that Plaintiff helps cook and clean,

has no problems with personal care, prepares her own meals each day, and goes outside three times a day. (R. 174-76). She is able to use public transportation by herself, shop for food once a week, handle money, read, watch television, and spend time with others. (R. 176-77). Mr. Hitchcock indicated that Plaintiff cannot finish what she starts and has only "medium" ability to handle stress and changes in her routine, but he denied noticing any unusual behavior or fears in his daughter. (R. 178-79).

Shortly thereafter, on October 7, 2009, Mr. Hitchcock provided a Daily Activities Telephone Report to DDS. (R. 182). According to the DDS adjudicator's notes of the conversation, Mr. Hitchcock stated that Plaintiff has a good appetite, sleeps well, keeps herself neat and clean, can travel by bus alone, and is able to manage her own money. (*Id.*). She is quiet and does not talk to Mr. Hitchcock much, but she has a friend she "goes with about every 10 days and a boy friend she sees 1-2 times a week." (*Id.*). Mr. Hitchcock said that he takes Plaintiff to the library to get books and she spends a lot of time in her room reading, and she also watches the news and keeps up with current events. She does not seem depressed to her father and makes sense when she talks, but Mr. Hitchcock is "not sure what her mental condition is." (*Id.*).

## D. Vocational Expert's Testimony

Mr. Breen testified at the hearing as a VE. The ALJ asked him to consider a hypothetical person of Plaintiff's age, education and past work experience who can "understand, remember, and carry out short and simple, one- or two-step instructions, with simple decision-making required; and, who can occasionally

interact with the public, co-workers and supervisors." (R. 73). The VE testified that such a person would be capable of working as a janitor (approximately 80,000 jobs available), warehouse worker (approximately 30,000 jobs available), or dishwasher (approximately 14,000 jobs available). (*Id.*). If the person could not "understand, remember, and carry out short and simple, one- to two-step tasks, or one- to two-step instructions to do such tasks on a sustained basis," however, then there would be no jobs she could perform. (R. 74). The individual would also be precluded from all employment if she were "unable to maintain pace or persistence more than 15 percent of the day." (R. 74-75).

**E.      Administrative Law Judge's Decision**

The ALJ found that Plaintiff's history of traumatic brain injury, cognitive disorder, bipolar disorder, and psychotic disorder are severe impairments, but that they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 18-20). After reviewing the medical records, the ALJ determined that Plaintiff has the capacity to work at all exertional levels with the following restrictions: she can understand, remember and carry out only short and simple one- or two-step instructions with simple decision-making required; and she is limited to only occasional interaction with the public, co-workers, and supervisors. (R. 20).

In reaching this conclusion, the ALJ first noted Dr. Pfeiffer's opinion that Plaintiff's past memory is "quite impaired," and that she is "hypomanic and hyperverbal" with "highly impaired boundaries and a striking lack of awareness about her own interpersonal behavior." (R. 19-20). The ALJ also cited to Ms.

Lewis's October 13, 2010 neuropsychological evaluation that Plaintiff has deficits in executive functioning, attention, and verbal fluency. (R. 20). After finding that Plaintiff's complaints of disabling limitations were not fully credible, the ALJ accepted the opinions of Dr. DiFonso and Dr. Henson that she can perform simple one- and two-step tasks despite having moderate limitations in: understanding, remembering and carrying out detailed instructions; and maintaining concentration. (R. 22). The ALJ acknowledged that Plaintiff submitted evidence of a psychotic disorder that post-dated the consultative evaluations, but found that the diagnosis did not change the RFC assessment. (R. 22-23).

Based on the stated RFC, the ALJ accepted the VE's testimony that Plaintiff remains capable of performing a significant number of jobs available in the Chicago metropolitan area, including janitor (80,000 jobs available), warehouse worker (30,000 jobs available), or dishwasher (14,000 jobs available). (R. 23). The ALJ thus concluded that Plaintiff is not disabled within the meaning of the Social Security Act, and is not entitled to benefits.

## DISCUSSION

### A. Standard of Review

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it

"displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B.    Five-Step Inquiry

To recover SSI under Title XVI of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act. 42 U.S.C. § 1382c(a)(3); *Rapsin v. Astrue*, No. 10 C 318, 2011 WL 3704227, at *5 (N.D. Ill. Aug. 22, 2011). A person is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42

U.S.C. § 1382c(a)(3)(A). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**C.     Analysis**

Plaintiff claims that the ALJ's decision must be reversed because he: (1) ignored medical evidence favorable to her claim; and (2) failed to account for all of her mental limitations in making the RFC determination, resulting in an incomplete hypothetical question to the VE.

### 1.     Consideration of Medical Evidence

Plaintiff first objects that the ALJ failed to consider significant evidence that supports her allegations of disability. For example, though Dr. Pfeiffer found that Plaintiff needed constant redirection, would speak on until interrupted, exhibited circumstantial, pressured and somewhat disorganized speech, and had impaired judgment and insight, the ALJ said nothing about these observations. (Doc. 18, at 4-5; Doc. 26, at 2). In addition, out of all the treatment records from Oak Forest, the ALJ cited to only one – the October 2010 neuropsychological evaluation from Ms. Lewis – and Plaintiff believes he did not discuss that report in sufficient detail. (*Id.* at 5; Doc. 26, at 3).

The Seventh Circuit has long held that an ALJ "need not provide a complete written evaluation of every piece of testimony and evidence" as long as he builds a logical bridge from the evidence to his conclusion. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (internal quotations omitted). *See also Hodges v. Barnhart*, 399 F. Supp. 2d 845, 859 (N.D. Ill. 2005) ("[A]n ALJ cannot be expected to discuss every symptom mentioned in an extensive medical history."). Here, the ALJ clearly considered Dr. Pfeiffer's evaluation, noting her description of Plaintiff as "'hypomanic and hyperverbal' with 'highly impaired boundaries and a striking lack of awareness about her own interpersonal behavior.'" (R. 19, 215). The ALJ also acknowledged that Plaintiff performed "uneven[ly]" on Dr. Pfeiffer's mental status exam, exhibiting intact orientation and immediate and recent memory, but proving "quite impaired" in past memory. (R. 19-20, 215).

In light of this evidence, the Court is satisfied that the ALJ did not cherry-pick only the positive portions of Dr. Pfeiffer's evaluation while ignoring the negative findings. (Doc. 18, at 7-8) (citing *Flores v. Astrue*, No. 10 C 6512, 2012 WL 1463481, at *6 (N.D. Ill. Apr. 26, 2012)) ("An ALJ may not selectively rely on a treating physician's notes indicating a claimant had improved with treatment, while disregarding notes indicating the claimant was still markedly limited in his ability to work."). This is especially true given that Dr. DiFonso discussed and considered Dr. Pfeiffer's report in determining Plaintiff's mental RFC, and the ALJ expressly discussed and relied on Dr. DiFonso's assessment. (R. 22-23, 233, 237). Plaintiff may believe that certain statements in the report evidence greater functional limitations, (Doc. 18, at 5), but Dr. DiFonso's opinion to the contrary

(as affirmed by Dr. Henson) stands uncontroverted, and Plaintiff's speculation in that regard is not a basis for remanding this case.  *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) ("[E]ven if reasonable minds could differ concerning whether [the plaintiff] is disabled, we must nevertheless affirm the ALJ's decision denying her claims if the decision is adequately supported.") (internal quotations omitted).

For similar reasons, there is no merit to Plaintiff's claim that the ALJ selectively ignored records from Oak Forest that support her claim.  Plaintiff is correct that the ALJ cited only to Ms. Lewis's October 13, 2010 neuropsychological assessment, which showed that Plaintiff suffers from a psychotic disorder with "deficits in executive functioning, attention, and verbal fluency."  (R. 20, 22, 268).  That report, however, summarizes information from Plaintiff's June 2009 emergency department visit; notes that she is currently in therapy at Oak Forest with "a working diagnosis of Psychotic Disorder, N.O.S. with R/O [rule-out] Bipolar Disorder"; confirms that she is taking medications prescribed by a psychiatrist who stated that Plaintiff experiences delusions and depressive episodes; and cites to a May 10, 2010 psychological evaluation indicating the presence of a thought disorder and moderate depression.  (R. 266).  Notably, the official diagnosis of psychotic disorder came from notes provided by Ms. Garcia, Dr. Khattak and Dr. Gilliland in March, April and May 2010, and not from Ms. Lewis.  (R. 282, 284, 287).  The ALJ expressly stated that he considered that diagnosis in determining Plaintiff's RFC.  (R. 22-23).  *Cf. Johnson v. Astrue*, No. 11 C 3989, 2012 WL 3205039, at *11 (N.D. Ill. Aug. 2,

2012) (ALJ erred in ignoring a diagnosis of "chronic lumbar radiculopathy with 'strong preponderance of back pain.'").  On this record, the Court cannot say that the ALJ ignored relevant treatment notes from Oak Forest.

Plaintiff's citation to *Bauer v. Astrue*, 532 F.3d 606 (7th Cir. 2008), does not warrant a contrary finding.  In *Bauer*, the Seventh Circuit cautioned that "[a] person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days . . . Suppose that half the time she is well enough that she could work, and half the time she is not.  Then she could not hold down a full-time job." *Id.* at 609.  The facts of *Bauer* are easily distinguishable because the plaintiff there was hospitalized on a number of occasions with hallucinations, racing thoughts, and thoughts of suicide, and both of her treating physicians opined that she could not hold down a full-time job.  *Id.* at 607.  Here, conversely, there is no evidence that Plaintiff has ever been hospitalized for her mental condition or had suicidal thoughts, and no physician indicated that she is incapable of working. *Schreiber v. Astrue*, No. 10 C 50167, 2012 WL 1886468, at *11 (N.D. Ill. May 23, 2012) (reliance on *Bauer* misplaced where the plaintiff was hospitalized for her bipolar disorder only once and then showed consistent improvement).

In sum, the ALJ adequately considered and discussed Dr. Pfeiffer's report and relevant treatment notes from Oak Forest, and did not selectively ignore evidence favorable to Plaintiff's claim.  Her request for remand on this basis is denied.

## 2.    RFC Determination

Plaintiff next argues that the ALJ's RFC determination fails to account for her moderate limitations in social functioning, concentration, persistence or pace. A claimant's RFC is the maximum work that she can perform despite any limitations.  20 C.F.R. § 404.1545(a)(1); SSR 96-8p.  The RFC determination is a legal decision rather than a medical one.  20 C.F.R. § 404.1527(d)(2).  "When determining the RFC, the ALJ must consider all medically determinable impairments, . . . even those that are not considered 'severe.'"  *Craft*, 539 F.3d at 676.

### a.    Social Functioning

The ALJ found that Plaintiff has moderate difficulties in social functioning such that she is limited to only occasional interaction with the public, co-workers and supervisors.  (R. 19, 20).  Plaintiff argues that the ALJ failed to explain how he reached this conclusion, and claims that she actually has greater restrictions in this area.  (Doc. 18, at 9).  By way of example, Plaintiff cites to notes from Stroger, Dr. Pfeiffer and Oak Forest variously indicating that she "had pressured speech, flight of ideas, tangential, disorganized and/or bizarre thought processes, exaggerated, agitated, and/or anxious mood, had to be redirected frequently, and had a presentation of a young girl rather than a mature woman."  (*Id*. at 9) (citing R. 248, 265, 269, 272, 276, 283, 287, 293).

Though the ALJ did not mention every one of these symptoms, he did discuss Dr. DiFonso's report, which stated that Plaintiff is not significantly limited in terms of social functioning and has normal interpersonal and adaptive skills.

(R. 22, 236-37). As noted, Dr. DiFonso's opinion is based on Dr. Pfeiffer's evaluation, which documented several of the behaviors Plaintiff deems important, including: her need for constant redirection; her circumstantial, pressured and somewhat disorganized speech; her marked grandiosity in thinking about career goals; and her labile affect. (R. 213, 215). The ALJ also discussed testimony from Plaintiff and her father that she has many friends, is friendly with the neighbors, goes to church and the grocery store, would go to the movies if she could afford it, and talks with her brother on the telephone. (R. 19, 57, 59-61, 182).

Despite this evidence of minimal impairment, the ALJ found it significant that Dr. Pfeiffer assessed Plaintiff as "'hypomanic and hyperverbal' with 'highly impaired boundaries and a striking lack of awareness about her own interpersonal behavior.'" (R. 19). The ALJ further noted that Plaintiff was diagnosed with psychotic disorder and expressly factored that into "assessing a significant limitation in social functioning." (R. 22-23). As a result, the ALJ found Plaintiff capable of only occasional contact with the public, co-workers, and supervisors, which the Social Security Regulations define as "from very little up to one-third of the time." SSR 96-9p; SSR 83-10.

Plaintiff has a different perspective on the record evidence and argues that the ALJ "should have considered whether her presentation at the hearing was consistent with the treatment notes, which it appears it was." (Doc. 26, at 4). In that regard, Plaintiff stresses that she "frequently interrupted the ALJ, and the ALJ had to repeatedly tell her to relax, slow down in answering questions, wait

for him to ask her questions, and let him talk." (*Id.*). As a preliminary matter, the ALJ discounted Plaintiff's credibility for a variety of reasons not challenged here (e.g., Ms. Lewis's observation that she "seemed to report what she thought the lawyers and/or judges wanted to hear in order to approve her for disability"). (R. 21, 22, 266). Moreover, the ALJ found Plaintiff more restricted in social functioning than any physician of record, and Plaintiff points to no contrary opinion. *See, e.g., Castile*, 617 F.3d at 929 (finding no error where "[i]t was because of and not in spite of [the claimant's] testimony that the ALJ limited her to a more restrictive residual functional capacity finding than any physician on the record."). Once again, her unsupported belief that various symptoms reflect more severe limitations is insufficient to establish that the ALJ's finding was erroneous. (Doc. 26, at 6).

Plaintiff cannot avoid this result by noting that "[t]here was no medical expert in this case." (Doc. 18, at 8). "Where, as here, an applicant for disability benefits is represented by counsel, the ALJ is 'entitled to assume that the applicant is making [her] strongest case for benefits.'" *Phillips v. Astrue*, 601 F.Supp.2d 1020, 1031 (N.D.Ill.2009) (quoting *Ray v. Bowen*, 843 F.2d 998, 1006 (7th Cir.1988)). Plaintiff does not argue that the ALJ should have obtained testimony from a medical expert, or that he failed to develop a full and fair record in this case. Nor does she challenge the VE's finding that a person with her background and social limitations can perform a variety of jobs available in the regional economy. *Cf. Spiva v. Astrue*, 628 F.3d 346, 352 (7th Cir. 2010) (ALJ erred in finding unrepresented plaintiff who "hears evil spirits" capable of stocking

shelves where no VE testified at the hearing).  Viewing the record as a whole, the ALJ's determination that Plaintiff can have only occasional contact with the public, co-workers, and supervisors is supported by substantial evidence.

### b.  Concentration, Persistence or Pace

Plaintiff finally argues that the ALJ did not adequately account for her moderate limitations in concentration, persistence or pace.  (R. 20, 237; Doc. 18, at 11).  Plaintiff directs the Court to *Stewart v. Astrue*, 561 F.3d 679 (7th Cir. 2009), where the Seventh Circuit made it clear that limiting an individual to simple, routine tasks is not sufficient to account for deficiencies in concentration, persistence or pace.  *Id*. at 684-85.  *See also Craft*, 539 F.3d at 677-78 (limitation to unskilled work did not provide any information as to the plaintiff's mental condition or abilities).  According to Plaintiff, the ALJ in this case violated *Stewart* by restricting her to "short and simple one or two step instructions with simple decision-making required."  (R. 20).

This argument ignores the fact that Dr. DiFonso found Plaintiff capable of "simple one-two step work tasks" despite her moderate cognitive and attentional limitations, (R. 237), and that Dr. Henson affirmed this finding.  (R. 261-63).  Where, as here, "a medical expert 'translated an opinion of the claimant's medical limitations into an RFC assessment' an ALJ may rely upon that translation."  *Adams v. Astrue*, 880 F. Supp. 2d 895, 912 (N.D. Ill. 2012) (quoting *Milliken v. Astrue*, 397 Fed. Appx. 218, 221-22 (7th Cir. 2010)).  *See also Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002) (no error where

physician translated moderate mental limitations into a specific RFC assessment that the plaintiff could still perform low-stress, repetitive work).

Plaintiff takes issue with the fact that the ALJ found her capable of one- to two-step *instructions* whereas Dr. DiFonso limited her to one- to two-step *tasks*. (Doc. 26, at 9). The Court views this as a distinction without a difference; it is clear that Plaintiff cannot do multi-step tasks if she cannot follow multi-step instructions. Plaintiff does not explain why instructions are significantly different from tasks in this context, and any error the ALJ made in re-phrasing the word is harmless. *See Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003) ("[T]he doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions."); *Scott v. Astrue*, 730 F. Supp. 2d 918, 935 (C.D. Ill. 2010) ("Harmless errors are those that do not affect the ALJ's determination that a claimant is not entitled to benefits.").

Plaintiff next objects that Dr. DiFonso and Dr. Henson did not have access to evidence from Oak Forest when they rendered their opinions. (Doc. 18, at 11-12; Doc. 26, at 5). The ALJ acknowledged as much, noting that "additional evidence was received after the reconsideration level in which [Plaintiff] was found to have a psychotic disorder." (R. 22). *Cf. Moore v. Colvin*, No. 11 C 5412, 2013 WL 2897662, at *5 (N.D. Ill. June 12, 2013) (ALJ's "reliance on [state agency psychological consultant's] assessment is problematic because [the physician] did not have access to [the plaintiff's] complete medical record, and the ALJ did not indicate that she had considered that fact in crediting his opinion."). The ALJ expressly considered the new diagnosis, as well as Ms.

Lewis's observation that Plaintiff has deficits in executive functioning and attention. (R. 20).

Plaintiff also speculates that she would not be able to maintain concentration, persistence or pace for 15% or more of the workday, but she has not identified any physician who suggested that she would be off-task that often. (Doc. 18, at 13). Nor did any physician find her incapable of performing simple tasks or following simple instructions as stated by Dr. DiFonso, and confirmed by Dr. Henson. *See Compean v. Astrue*, No. 09 C 5835, 2011 WL 1158191, at *8 (N.D. Ill. Mar. 28, 2011) (citing *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004)) (the ALJ "was entitled to rely upon the opinion of the state agency physician, particularly where no physician imposed any greater functional limitations than those found by the ALJ in her RFC determination."). Even Ms. Lewis observed that "it is not clear whether [Plaintiff's] impairments [in attention and executive dysfunction] are inhibiting [her] ability to work." (R. 268). Notably, there is no evidence that Plaintiff followed up on Ms. Lewis's suggestion that she obtain a vocational evaluation. (*Id.*).

Given that the ALJ properly accounted for Plaintiff's moderate limitations in concentration, persistence or pace in the RFC, there is no merit to Plaintiff's final argument that the hypothetical question posed to the VE was incomplete. (Doc. 18, at 13-14). A hypothetical question need only "set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record." *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008) (internal quotations omitted). *See also Wurst v. Astrue*, 866 F. Supp. 2d 951, 964-65

(N.D. Ill. 2012). Moreover, in formulating such a hypothetical question, an ALJ "may rely on a physician's statement if the physician has translated the claimant's mental limitations into terms describing the work the claimant can perform." *Chandler v. Astrue*, No. 08 C 2204, 2009 WL 3294791, at *5 (C.D. Ill. Oct. 9, 2009). *See also Milliken*, 397 Fed. Appx. at 221-22. As noted, Dr. DiFonso translated Plaintiff's moderate limitations into an RFC, and the ALJ's decision to rely on that opinion is supported by substantial evidence.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 18) is denied, and Defendant's Motion for Summary Judgment (Doc. 24) is granted. The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: June 28, 2013

_____
SHEILA FINNEGAN
United States Magistrate Judge